12 U.S. 253 (1814)
8 Cranch 253
THE VENUS, RAE, MASTER.
Supreme Court of United States.
March 12, 1814.
*255 PITMAN, for the captors.
*261 STOCKTON, contra, for M'Gregor, contended.
Absent. ... LIVINGSTON. J.
*273 WASHINGTON, J. after stating the facts of the case, delivered the opinion of the majority of the Court as follows:
The claims of Maitland, M`Gregor and Jones are resisted, in toto, upon an objection to the national character of the Claimants. The general question affecting *274 these parties, will, for the present, be postponed in order to dispose of particular objections which are made to all the claims, either in whole or in part, and which will depend on the particular circumstances applying to those cases.
1. The first claim that will be considered will be that of Lenox and Maitland to the 100 casks of white lead, which it is contended, is the property of Thos. Holloway, an acknowledged British subject, but shipped in June, 1812, by Wm. Maitland & Co. (a house established in Liverpool, and composed of Wm. Maitland and James Lenox) to Lenox and Maitland, a house established at New York, and composed of the same parties. To establish the fact of property in Thos. Holloway, the captor relies upon the following evidence: The original bill of parcels, enclosed in a letter under date of the 3d of July, 1812, from Wm. Maitland & Co. to Lenox and Maitland, which is headed thus, "Thos. Holloway bought of Thomas Walker & Co. lead merchants," dated June 2d, 1812. In corroboration of this prima facie evidence of property in Holloway, the freight and primage of this lead is cast in the margin of the bill of lading, but not so upon the acknowledged property of Lenox and Maitland, the owners of the ship, and included in the same bill of lading; from which circumstance it is argued that this article did not belong to Lenox and Maitland; since, if it did, no freight could have been charged on it, any more than upon the other parts of the cargo claimed by them. In addition to this, in a list of goods shipped by Wm. Maitland & Co. by this vessl, on account of and consigned to Lenox and Maitland, and enclosed in a letter of the 22d August, 1812, from the former to the latter, by the Lady Gallatin, all the goods claimed by that house separately, and also by them and M`Gregor jointly, are enumerated, except this parcel of white lead. This evidence is certainly very strong to fix a hostile character on this property; and is rendered conclusive by the omission of Maitland, in his affidavit made under the order for further proof, to say any thing in relation to the white lead, although he is very particular as to all the other property claimed by Lenox and Maitland, and by that house jointly with M`Gregor. This Court is *275 therefore of opinion that the Court below did right in rejecting this claim.
2. The next claim to be considered, is that of Magee and Jones to a part of the cargo on board of this vessel. Magee is a citizen of the United States, settled in New York, and connected with Jones in a house of trade. It is urged by the captors that the whole of this property ought to have been condemned as the sole property of Jones. The bill of lading of these goods expresses them to be shipped by M`Gregor & Co. unto and on account of James Magee & Co. of New York. The invoice is signed by Jones, at Manchester, in England, and describes them as goods to be shipped on board the Venus, and to be consigned to James Magee & Co. of New York; but it does not specify on whose account and risk. In a letter from Jones to Magee, dated the 1st of July, 1812, covering an invoice of these goods, he says "they are to be sold on joint account, or on mine at your option." The whole question, as to the exclusive property of Jones in these goods, is rested, by the captors, upon the above expressions giving an option to Magee to be jointly concerned or not in the shipment. The question of law is, in whom the right of property was at the time of capture? To effect a change of property as between seller and buyer, it is essential that there should be a contract of sale agreed to by both parties, and if the thing, agreed to be sold, is to be sent by the vendor to the vendee, it is necessary to the perfection of the contract that it should be delivered to the purchaser or to his agent, which the master, to many purposes, is considered to be. The only evidence of a contract, such as is now set up, appears in the affidavit of Magee; who states that, in 1810, he was in England, and agreed with Jones that the latter should ship goods on joint account, when the intercourse between the two countries should be opened; and that, in consequence of this agreement, the present shipment was made. Now admit that such an agreement was made, yet the delivery of the goods to the master of the vessel was not for the use of Magee and Jones, any more than it was for the use of the shipper solely; and, consequently, it amounted to nothing so as to divest the property out of the shipper, until Magee should elect to take them on joint account, or *276 to act as the agent of Jones. Until this election was made, the goods were at the risk of the shipper, which is conclusive as to the right of property.
3. The next claim is that of Lenox and Maitland to the ship. The facts in relation to this subject are, that James Lenox, as joint owner with W. Maitland of this ship, obtained, in November, 1811, a register for her, which was granted upon his oath, that he, together with W. Maitland, of the city of New York, merchant, were the only owners. At this time, Maitland was domiciled in Great Britain; and it is contended that the statement, that Maitland was of New York, was untrue, and subjected the vessel to forfeiture, under the act of congress of the 31st of December, 1792; and that although no claim is interposed for the United States, still the forfeiture produced by the misconduct of Lenox, is sufficient to turn him out of Court, whatever disposition may ultimately be made of the property. The rule of the prize Court is correctly stated in this argument; and the only question is, whether a forfeiture did accrue to the United States. The act of congress directs that the owner who takes the oath, in case there are more than one owner, shall, in his oath, specify the names and places of abode of such owners, and that they are citizens of the United States, if such be the fact; and if one or more of them reside abroad, as a partner or partners in a co-partnership consisting of citizens, and carrying on trade with the United States, that such is the case. The law then proceeds to declare, that if any of the matters of fact in the said oath alleged, within the knowledge of the party swearing, shall not be true, the ship shall be forfeited to the United States. It cannot be denied that, at the time this oath was taken, W. Maitland was a resident merchant of Great Britain, carrying on trade with the United States; a fact totally inconsistent with that alleged in the oath, that he was of the city of New York. It is probable, and the Court is willing to believe, that this statement was innocently made, under a misconception of the real character which the foreign domicil of Maitland had impressed upon him. But still, the law required explicitness on this point, and marked the distinction between a person residing abroad, and one residing within the United States. It must be admitted, in point of law, *277 that the fact sworn to by Lenox was not true; and the consequence is a forfeiture of the ship to the United States. The claim, therefore, of Lenox and Maitland to this vessel must be rejected. What order shall be made as to the ultimate disposition of the property, must depend upon the opinion which this Court may give in some other cases touching this subject.
The great question involved in this, and many other of the prize cases which have been argued, is, whether the property of these Claimants who were settled in Great Britain, and engaged in the commerce of that country, shipped before they had a knowledge of the war, but which was captured, after the declaration of war, by an American cruizer, ought to be condemned as lawful prize. It is contended by the captors, that as these Claimants had gained a domicil in Great Britain, and continued to enjoy if up to the time when war was declared, and when these captures were made, they must be considered as British subjects, in reference to this property, and, consequently, that it may legally be seized as prize of war, in like manner as if it had belonged to real British subjects. But if not so, it is then insisted, that these Claimants having, after their naturalization in the United States, returned to Great Britain, the country of their birth, and there re-settled themselves, they became reintegrated British subjects, and ought to be considered by this Court in the same light as if they had never emigrated. On the other side it is argued, that American citizens settled in the country of the enemy, as these persons were, at the time war was declared, were entitled to a reasonable time to elect, after they knew of the war, to remain there, or to return to the United States; and that, until such election was, bona fide, made, the Courts of this country are bound to consider them as American citizens, and their property shipped before they had an opportunity to make this election, as being protected against American capture.
There being no dispute as to the facts upon which the domicil of these Claimants is asserted, the questions of law alone remain to be considered. They are two.  First, By what means and to what extent, a national character may be impressed upon a person, different *278 from that which permanent allegiance gives him? and secondly, What are the legal consequences to which this acquired character may expose him, in the event of a war taking place between the country of his residence and that of his birth, or in which he had been naturalized?
1. The writers upon the law of nations distinguish between a temporary residence in a foreign country, for a special purpose, and a residence accompanied with an intention to make it a permanent place of abode. The latter is styled by Vattel, domicil, which he defines to be, "a habitation fixed in any place, with an intention of always staying there." Such a person, says this author, becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of an inferior order from the native citizens; but is, nevertheless, united and subject to the society, without participating in all its advantages. This right of domicil, he continues, is not established, unless the person makes sufficiently known his intention of fixing there, either tacitly, or by an express declaration. Vatt. p, 92, 93  Grotius no where uses the word domicil, but he also distinguishes between those who stay in a foreign country by the necessity of their affairs, or from any other temporary cause, and those who reside there from a permanent cause. The former he denominates strangers, and the latter, subjects; and it will presently be seen, by a reference to the same author, what different consequences these two characters draw after them.
The doctrine of the prize Courts, as well as of the Courts of common law, in England, which, it was hinted, if not asserted, in argument, had no authority of universal law to stand upon, is the same with what is stated by the above writers; except that it is less general, and confines the consequences resulting from this acquired character to the property of those persons engaged in the commerce of the country in which they reside.
It is decided by those Courts, that whilst an Englishman, or a neutral, resides in a hostile country, he is a subject of that country, and is to be considered, (even *279 by his own or native country, in the former case) as having a hostile character impressed upon him.
In deciding whether a person has obtained the right of an acquired domicil, it is not to be expected that much, if any, assistance should be derived from mere elementary writers on the law of nations. They can only lay down the general principles of law; and it becomes the duty of Courts to establish rules for the proper application of those principles. The question, whether the person to be affected by the right of domicil had sufficiently made known his intention of fixing himself permanently in the foreign country, must depend upon all the circumstances of the case. If he had made no express declaration on the subject, and his secret intention is to be discovered, his acts must be attended to, as affording the most satisfactory evidence of his intention. On this ground it is, that the Courts of England have decided, that a person who removes to a foreign country, settles himself there, and engages in the trade of the country, furnishes, by these acts, such evidence of an intention permanently to reside there, as to stamp him with the national character of the state where he resides. In questions on this subject, the chief point to be considered, is the animus manendi; and Courts are to devise such reasonable rules of evidence as may establish the fact of intention. If it sufficiently appear that the intention of removing was to make a permanent settlement, or for an indefinite time, the right of domicil is acquired by a residence even of a few days. This is one of the rules of the British Courts, and it appears to be perfectly reasonable. Another is, that a neutral or subject, found residing in a foreign country is presumed to be there animo manendi; and if a state of war should bring his national character into question, it lies upon him to explain the circumstances of his residence  The Bernon, 1, Rob. 86, 102. As to some other rules of the prize Courts of England, particularly those which fix a national character upon a person on the ground of constructive residence, or the peculiar nature of his trade, the Court is not called upon to give an opinion at this time: because, in this case, it is admitted that the Claimants had acquired a right of domicil in Great *280 Britain, at the time of the breaking out of the war between that country and the United States.
2. The next question is, what are the consequences to which this acquired domicil may legally expose the person entitled to it, in the event of a war taking place between the government under which he resides and that to which he owes a permanent allegiance? A neutral in his situation, if he should engage in open hostilities with the other belligerent, would be considered and treated as an enemy. A citizen of the other belligerent could not be so considered, because he could not, by any act of hostility, render himself, strictly speaking, an enemy, contrary to his permanent allegiance. But although he cannot be considered an enemy, in the strict sense of the word, yet he is deemed such, with reference to the seizure of so much of his property concerned in the trade of the enemy, as is connected with his residence. It is found adhering to the enemy. He is himself adhering to the enemy, although not criminally so, unless he engages in acts of hostility against his native country, or, probably, refuses, when required by his country, to retarn. The same rule, as to property engaged in the commerce of the enemy, applies to neutrals; and for the same reason. The converse of this rule inevitably applies to the subject of a belligerent state domiciled in a neutral country; he is deemed a neutral by both bellig rents, with reference to the trade which he carries on with the adverse belligerent, and with all the rest of the world.
But this national character which a man acquires by residence, may be thrown off at pleasure, by a return to his native country, or even by turning his back on the country in which he has resided, on his way to another. To use the language of sir W. Scott. it is an adventitious character gained by residence, and which ceases by non-residence. It no longer adheres to the party from the moment he puts himself in motion, bona fide, to quit the country sine animo revertendi. 3 Rob. 17, 12. The Indian Chief. The reasonableness of this rule can hardly be disputed. Having once acquired a national character by residence in a foreign country, he ought to be bound by all the consequences of it, until he has thrown it off, either by an actual return to his *281 native country, or to that where he was naturalized, or by commencing his removal, bona fide, and without an intention of returning. If any thing short of actual removal be admitted to work a change in the national character acquired by residence, it seems perfectly reasonable that the evidence of a bona fide intention to remove should be such as to leave no doubt of its sincerity. Mere declarations of such an intention ought never to be relied upon, when contradicted, or at least rendered doubtful, by a continuance of that residence which impressed the character. They may have been made to deceive; or, if sincerely made, they may never be executed. Even the party himself ought not to be bound by them, because he may afterwards find reason to change his determination, and ought to be permitted to do so. But when he accompanies those declarations by acts which speak a language not to be mistaken, and can hardly fail to be consummated by actual removal, the strongest evidence is afforded, which the nature of such a case can furnish. And is it not proper that the Courts of a belligerent nation should deny to any person the right to use a character so equivocal, as to put it in his power to claim which ever may best suit his purpose, when it is called in question? If his property be taken trading with the enemy, shall he be allowed to shield it from confiscation, by all ging that he had intended to remove from the country of the enemy to his own, then neutral, and, therefore, that, as a neutral, the trade was lawful? If war exist between the country of his residence and his native country, and his property be seized by the former, or by the latter, shall he be heard to say in the former case, that he was a domiciled subject of the country of the captor, and in the latter, that he was a native subject of the country of that captor also, because he had declared an intention to resume his native character; and thus to parry the belligerent rights of both? It is to guard against such inconsistencies, and against the frauds which such pretensions, if tolerated, would sanction, that the rule above mentioned has been adopted. Upon what sound principle can a distinction be framed between the case of a neutral, and the subject of one belligerent domiciled in the country of the other at the breaking out of the war? The property of each, found engaged in the commerce of their adopted country, belonging to them, *282 before the war, in their character of subjects of that country, so long as they continued to retain their domicil; and when a state of war takes place between that country and any other, by which the two nations and all their subjects become enemies to each other, it follows that the property, which was once the property of a friend, belongs now, in reference to that property, to an enemy. This doctrine of the common law and prize Courts of England is founded, like that mentioned under the first head, upon national law; and it is believed to be strongly supported by reason and justice. It is laid down by Grotius, p. 563, "that all the subjects of the "enemy who are such from a permanent cause, that is "to say, settled in the country, are liable to the law of "reprisals, whether they be natives or foreigners; but "not so if they are only trading or sojourning for a "little time." And why, it may be confidently asked, should not the property of such subjects be exposed to the law of reprisals and of war, so long as the owner retains his acquired domicil, or, in the words of Grotius, continues a permanent residence in the country of the enemy? They were before, and continue after the war, bound, by such residence, to the society of which they are members, subject to the laws of the state, and owing a qualified allegiance thereto; they are obliged to defend it. (with an exception in favor of such a subject, in relation to his native country) in return for the protection it affords them, and the privileges which the laws bestow upon them as subjects. The property of such persons, equally with that of the native subjects in their totality, is to be considered as the goods of the nation, in regard to other states. It belongs, in some sort, to the state, from the right which she has over the goods of its citizens which make a part of the sum total of its riches, and augment its power. Vatt. 147, and also B. 1, c. 14, § 182. In reprisals, continues the same author, we seize on the property of the subject, just as we would that of the sovereign; every thing that belongs to the nation is subject to reprisals, wherever it can be seized, with the exception of a deposit entrusted to the public faith. B. 2, c. 18, § 344. Now if, a permanent residence constitutes the person a subject of the country where he is settled, so long as he continues to reside there, and subjects his property to the law of reprisals, as a part of the property of the *283 nation, it would seem difficult to maintain that the same consequences would not follow in the case of an open and public war, whether between the adopted and native countries of persons so domiciled, or between the former and any other nation. If, then, nothing but an actual removal, or a bona fide beginning to remove, can change a national character acquired by domicil, and if, at the time of the inception of the voyage, as well as at the time of capture, the property belonged to such domiciled person in his character of a subject, what is there that does, or ought to exempt it from capture by the privateers of his native country, if, at the time of capture, he continues to reside in the country of the adverse belligerent? It is contended that a native or naturalized subject of one country, who is surprised in the country where he was domiciled by a declaration of war, ought to have time to make his election to continue there, or to remove to the country to which he owes a permanent allegiance; and that, until such election is made, his property ought to be protected from capture by the cruizers of the latter. This doctrine is believed to be as unfounded in reason and justice, as it clearly is in law. In the first place, it it founded upon a presumption that the person will certainly remove, before it can possibly be known whether he may elect to do so or not. It is said that this presumption ought to be made, because, upon receiving information of the war, it will be his duty to return home. This position is denied. It is his duty to commit no acts of hostility against his native country, and to return to her assistance when required to do so; nor will any just nation, regarding the mild principles of the law of nations, require him to take arms against his native country, or refuse her permission to him to withdraw whenever he wishes to do so, unless under peculiar circumstances, which, by such removal at a critical period, might endanger the public safety. The conventional law of nations is in conformity with those principles. It is not uncommon to stipulate in treaties that the subjects of each shall be allowed to remove with their property, or to remain unmolested. Such a stipulation does not coerce those subjects either to remove or to remain. They are left free to chuse for themselves; and when they have made their election, they claim the right of enjoying *284 it under the treaty. But until the election is made, their former character continues unchanged.
Until this election is made, if his property found upon the high seas, engaged in the commerce of his adopted country, should be permitted, by the cruizers of the other belligerent, to pass free, under the notion that he may elect to remove, upon notice of the war, and should arrive safe, what is to be done in case the owner of it should afterwards elect to remain where he is? or, if captured and brought immediately to adjudication, it must, upon this doctrine, be acquitted until the election to remain is made and known. In short, the point contended for would apply the doctrine of relation to cases where the party claiming the benefit of it may gain all, and can lose nothing. If he, after the capture, should find it his interest to remain where he is domiciled, his property embarked before his election was made, is safe; and if he finds it best to return, it is safe of course. It is safe whether he goes or stays. This doctrine, producing such contradictory consequences, is not only unsupported by any authority, but it would violate principles long and well established in the prize Courts of England, and which ought not, without strong reasons which may render them inapplicable to this country, to be disregarded by this Court. The rule there, is, that the character of property, during war, cannot be changed in transitu, by any act of the party, subsequent to the capture. The rule indeed goes farther: as to the correctness of which in its greatest extension no opinion need now be given; but it may safely be affirmed that this change cannot and ought not to be effacted by an election of the owner and shipper of it made subsequent to the capture, and, more especially, after a knowledge of the capture is obtained by the owner. Observe the consequences which would result from it. The capture is made and known. The owner is allowed to deliberate whether it is his interest to remain a subject of his adopted, or of his native country. If the capture be made by the former, then he elects to be a subject of that country; if by the latter, then a subject of that. Can such a privileged situation be tolerated by either belligerent? Can any system of law be correct, which places an individual who adheres to one belligerent, and, to the period of his election to remove, *285 contributes to encrease her wealth, in so anomalous a situation as to be clothed with the privileges of a neutral, as to both belligerents? This notion about a temporary state of neutrality impressed upon a subject of one of the belligerents, and the consequent exemption of his property from capture by either, until he has had notice of the war and made his election, is altogether a novel theory, and seems, from the course of the argument, to owe its origin to a supposed hardship to which the contrary doctrine exposes him. But if the reasoning employed on this subject be correct, no such hardship can exist. For if, before the election is made, his property on the ocean is liable to capture by the cruizers of his native and deserted country, it is not only free from capture by those of his adopted country, but is under its protection. The privilege is supposed to be equal to the disadvantage, and is therefore just. The double privilege claimed seems too unreasonable to be granted.
It will be observed, that in the foregoing opinion respecting the nature and consequences of domicil, very few cases have been referred to. It was thought best not to interrupt the chain of argument, by stopping to examine cases; but faithfully to present the essential principles to be extracted from those which were cited at the bar, or which have otherwise come under the view of the Court, and which applied to the subject. With what success this has been executed, is not for me to decide. But there are two or three cases which seem to be so applicable, and at the same time so conclusive on the great points of this question, that it may not be improper briefly to notice them. In support of the general principles, that the national character of the owner at the time of capture, must decide his right to claim, and that a subject is condemned by it, even in the Courts of his native country, without time being allowed to him to elect to remove, the following cases may be referred to. In the Boedes Lust, 5 Rob. 247, it was decided that the property of a resident of Demarara, shipped before hostilities of any kind had occurred between Holland and Great Britain, but which was captured under an embargo declared by England upon Dutch property, as preparatory to war which ensued soon after the seizure, was, by the retroactive effect of the war applied to property so seized, to be consider *286 ed as the property of an enemy taken in war. In this case, sir W. Scott lays it down, that, where property is taken in a state of hostility, the universal practice has ever been to hold it subject to condemnation, although the Claimants may have become friends and subjects prior to the adjudication. This case is somewhat stronger than the present, in the circumstance that in that, the state of hostility, alleged to have existed at the time of capture was made out by considering the subsequent declaration of war as relating back to the time of seizure under the embargo, by which reference it was decided to be a hostile embargo, and of course tantamount to an actual state of war. But this case also proves, not only that the hostile character of the property at the time of capture establishes the legality of it, but that no future circumstance changing the hostile character of the Claimant to that of a friend or subject, can entitle him to restitution. Whether the Claimant, in this case, was a neutral or a British subject, does not appear. But if the former, it will not, it is presumed, be contended that he is, upon the principles of national law, less to be favored in the Courts of the belligerent, than a subject of that nation domiciled in the country of the adverse belligerent. Whitehill's case, however, referred to frequently in Rob. reports, comes fully up to the present, because he was a British subject, who had settled but a few days in the hostile country, but before he knew or could have known of the declaration of war; yet, as he went there with an intention to settle, this, connected with his residence, short as it was, fixed his national character, and identified him with the enemy of the country he had so recently quitted. The want of notice, and of an opportunity to extricate himself from a situation to which he had so recently and so innocently exposed himself, could not prevail to protect his property against the belligerent rights of his own country, and to save it from confiscation. There are many other strong cases upon these points, which I forbear to notice particularly, from an unwillingness to swell this opinion already too long.
The sentence of the Court is as follows:
This cause came on to be heard on the transcript of the record, and was argued by counsel; on consideration whereof, it is decreed and ordered that the sentence of *287 the Circuit Court of Massachusetts condemning the one hundred casks of white lead claimed by Lenox and Maitland be, and the same is hereby affirmed with costs. And that the sentence of the said Circuit Court as to the claim of Magee and Jones to twenty-one trunks of merchandize be, and the same is hereby reversed and annulled; and, that the said twenty-one trunks of merchandize be condemned to the captors; and that the sentence of the said Circuit Court as to the ship Venus claimed by Lenox and Maitland be and the same is hereby reversed; and that the said ship Venus be condemned, the one half thereof to the captors, the other half to the United States, under the order of the said Circuit Court. That the sentence of the said Circuit Court as to the claim of Wm. Maitland to one half of one hundred and fifty crates of earthen ware, thirty-five cases and three casks of copper, nine pieces of cotton bagging and twenty and four twentieths tons of coal, be and the same is hereby reversed, and that the same be condemned to the captors; and that the sentence of the said Circuit Court, as to the claim of Alexander M'Gregor to one half of one hundred and ninety-eight packages of merchandize as the joint property of himself and Lenox and Maitland, and of the claim of Wm. Maitland for one fourth of the same goods, and of the claim of Alexander M'Gregor to twenty-five pieces of cotton bagging and five trunks of merchandize, he, and the same is hereby reversed and annulled, and that the same he condemned to the captors; and that the said cause be remanded to the said Circuit Court for further proceedings to be had therein.
JOHNSON, J. declined giving an opinion.
STORY, J.
I do not sit in this cause: but the great question involved in it, respecting the effect of domicil on national character, forms the leading point in many cases before the Court. Those cases have been ably and fully argued, and I have listened, with great solicitude and attention, to the discussion. On so important a question, where a difference of opinion has been expressed on the bench, I do not feel at liberty to withdraw myself from the responsibility which the law imposes on me. The parties in the other cases have a right to my opinion; and, however painful it is, in the embarrassing *288 situation in which I stand, to declare it, I shall not shrink from what I deem a peremptory duty. The question is not new to me: It has been repeatedly before me in the Circuit Court, and has been applied sometimes to relieve and sometimes to condemn the Claimant. I shall not pretend to go over the grounds of argument; but content myself with declaring my entire concurrence in the opinion expressed by Judge Washington on this point.
MARSHALL, Ch. J.
I entirely concur in so much of the opinion delivered in this case, as attaches a hostile character to the property of an American citizen continuing, after the declaration of war, to reside and trade in the country of the enemy; and I subscribe implicitly to the reasoning urged in its support. But from so much of that opinion as subjects to confiscation the property of a citizen shipped before a knowledge of the war, and which disallows the defence founded on an intention to change his domicil and to return to the United States, manifested in a sufficient manner, and within a reasonable time after knowledge of the war, although it be subsequent to the capture, I feel myself compelled to dissent.
The question is undoubtedly complex and intricate. It is difficult to draw a line of discrimination which shall be at the same time precise and equitable. But the difficulty does not appear to me to be sufficient to deter Courts from making the attempt.
A merchant residing abroad for commercial purposes may certainly intend to continue in the foreign country so long as peace shall exist, provided his commercial objects shall detain him so long, but to leave it the instant war shall break out between that country and his own. This intention, it is not necessary to manifest during peace; and when war shall commence, the belligerent cruizer may find his property on the ocean, and may capture it, before he knows that war exists. The question whether this be enemy property or not, depends, in my judgment, not exclusively on the residence of the owner at the time, but on his residence taken in connexion with his national character as a citizen, and with his intention to continue or to discontinue his commercial domicil in the event of war.
*289 The evidence of this intention will rarely, if ever, be given during peace. It must, therefore, be furnished, if at all, after the war shall be known to him; and that knowledge may be preceded by the capture of his goods. It appears to me, then, to be a case in which, as in many others, justice requires that subsequent testimony shall be received to prove a pre-existing fact. Measures taken for removal immediately after a war, may prove a previous intention to remove in the event of war, and may prove that the captured property, although, prima facie, belonging to an enemy, does, in fact, belong to a friend. In such case, the citizen, in my opinion, has a right, in the nature of the jus postliminii, to claim restitution.
As this question is not only decisive of many claims now depending before this Court, but is also of vast importance to our merchants generally, I may be excused for stating, at some length, the reasons on which my opinion is founded.
The whole system of decisions applicable to this subject, rests on the law of nations as its base. It is, therefore, of some importance to enquire how far the writers on that law consider the subjects of one power residing within the territory of another, as retaining their original character, or partaking of the character of the nation in which they reside.
Vattel, who, though not very full to this point, is more explicit and more satisfactory on it than any other whose work has fallen into my hands, says, "the citizens are "the members of the civil society; bound to this society "by certain duties, and subject to its authority, they "equally participate in its advantages. The natives, or "indigenes, are those born in the country, of parents "who are citizens. Society not being able to subsist "and to perpetuate itself but by the children of the citizens, "those children naturally follow the condition of "their fathers, and succeed to all their rights."
"The inhabitants, as distinguished from citizens, are "strangers who are permitted to settle and stay in the "country. Bound by their residence to the society, they "are subject to the laws of the state, while they reside "there, and they are obliged to defend it, because it grants *290 "them protection, though they do not participate in all "the rights of citizens. They enjoy only the advantages "which the laws, or custom gives them. The perpetual "inhabitants are those who have received the right "of perpetual residence. These are a kind of citizens "of an inferior order, and are united and subject to the "society, without participating in all its advantages."
"The domicil is the habitation fixed in any place, "with an intention of always staying there. A man "does not, then, establish his domicil in any place, unless "he makes sufficiently known his intention of fixing "there, either tacitly or by an express declaration. "However, this declaration is no reason why, if he afterwards "changes his mind, he may not remove his "domicil elsewhere. In this sense, he who stops, even "for a long time, in a place, for the management of his "affairs, has only a simple habitation there, but has no "domicil."
A domicil, then, in the sense in which this term is used by Vattel, requires not only actual residence in a foreign country, but "an intention of always staying there." Actual residence without this intention, amounts to no more than "simple habitation."
Although this intention may be implied without being expressed, it ought not, I think, to be implied, to the injury of the individual, from acts entirely equivocal. If the stranger has not the power of making his residence perpetual, if circumstances, after his arrival in a country, so change, as to make his continuance there disadvantageous to himself, and his power to continue, doubtful; "an intention always to stay there" ought not, I think, to be fixed upon him, in consequence of an unexplained residence previous to that change of circumstances. Mere residence, under particular circumstances, would seem to me, at most, to prove only an intention to remain so long as those circumstances continue the same, or equally advantageous. This does not give a domicil. The intention which gives a domicil is an unconditional intention "to stay always."
The right of the citizens or subjects of one country to remain in another, depends on the will of the sovereign *291 of that other; and if that will be not expressed otherwise than by that general hospitality which receives and affords security to strangers, it is supposed to terminate with the relations of peace between the two countries. When war breaks out, the subjects of one belligerent in the country of the other are considered as enemies, and have no right to remain there.
Vattel says, "enemies continue such wherever they "happen to be. The place of abode is of no account "here. It is the political ties which determine the quality. "While a man remains a citizen of his own country, "he remains the enemy of all those with whom his "nation is at war."
It would seem to me, to require very strong evidence of an intention to become the permanent inhabitant of a foreign country, to justify a court in presuming such intention to continue, when that residence must expose the person to the inconvenience of being considered and treated as an enemy. The intention to be inferred solely from the fact of residence during peace, for commercial purposes, is, in my judgment, necessarily conditional, and dependent on the continuance of the relations of peace between the two countries.
So far is the law of nations from considering residence in a foreign country in time of peace, as evidence of an intention "always to stay there," even in time of war, that the very contrary is expressed. Vattel says, "the "sovereign declaring war can neither detain those subjects "of the enemy who are within his dominions at the "time of the declaration, nor their effects. They came "into his country on the public faith. By permitting "them to enter his territory and to continue there, he "tacitly promised them liberty and security for their "return. He is therefore to allow them a reasonable "time for withdrawing with their effects; and if they "stay beyond the time prescribed, he has a right to treat "them as enemies, though as enemies disarmed."
The stranger merely residing in a country during peace, however long his stay, and whatever his employment, provided it be such as strangers may engage in, cannot, on the principles of national law, be considered *292 as incorporated into that society, so as, immediately on a declaration of war, to become the enemy of his own. "His property," says Vattel, "is still a part of the totality "of the wealth of his nation." "The citizen or subject "of a state, who absents himself for a time, without "any intention to abandon the society of which he is a "member, does not lose his privilege by his absence; "he preserves his rights, and remains bound by the "same obligations. Being received in a foreign country, "in virtue of the natural society, the communication "and commerce, which nations are obliged to cultivate "with each other, he ought to be considered there as a "member of his own nation, and treated as such."
The subject of one power inhabiting the country of another, ought not to be considered as a member of the nation in which he resides, even by foreigners; nor ought he, on the first commencement of hostilities, to be treated as an enemy by the enemies of that nation.
Burlamaqui says, "as to strangers, those who settle in "the enemy's country after a war is begun, of which "they had previous notice, may justly be looked upon "as enemies and treated as such. But in regard to such "as went thither before the war, justice and humanity "require that we should give them a reasonable time to "retire; and if they neglect that opportunity, they are "accounted enemies."
If this rule be obligatory on foreign nations, much more ought it to bind that of which the individual is a member.
I think I cannot be mistaken when I say that, in all the views taken of this subject by the most approved writers on the law of nations, the citizen of one country residing in another, is not considered as incorporated in that other, but is still considered as belonging to that society of which he was originally a member. And if war break out between the two nations, he is to be permitted, and is expected, to return to his own. I do not perceive in those writers any exception with regard to merchants.
It must, however, be acknowledged that the great extension *293 of commerce has had considerable influence on national law. Rules have been adopted, perhaps by general consent, principles have been engrafted on the original stalk of public law, by which merchants, while belonging politically to one society, are considered commercially as the members of another. For commercial purposes the merchant is considered as a member of that society in which he has his domicil; and less conclusive evidence than would seem to be required in general cases, by the law of nations, has been allowed to fix the domicil for commercial purposes. But I cannot admit that the original meaning of the term is to be entirely disregarded, or the true nature of this domicil to be overlooked. The effects of the rule ought to be regulated by the motives which are presumed to have induced its establishment, and by the convenience it was intended to promote.
The policy of commercial nations receives foreign merchants into their bosom; and permits their own citizens to reside abroad for the purposes of trade without injury to their rights or character as citizens. This free intercommunication must certainly be believed, by the nations who allow it, to be promotive of their interests. Nor is this opinion ill founded. Nothing can be more obvious than that the affairs of a commercial company will be transacted to most advantage by being conducted, as it respects both purchase and sale, under the eye of a person interested in the result. The nation which takes an interest in the prosperity of its commerce, can feel no inclination to restrain its citizens from residence abroad for the purposes of commerce; nor will it hastily construe such residence into a change of national character, to the injury of the individual. It is not the policy of such a nation, nor can it be its wish, to restrain its citizens from pursuing abroad a business which tends to enrich itself. It ought not, then, to consider them as enemies in consequence of their having engaged in such pursuit in the country of a friend, who, before their removal, becomes an enemy.
If, indeed, it be the real intention of the citizen permanently to change his national character, if it be his choice to remain in the country of the enemy during *294 war, there can be no harshness  no injustice in treating him as an enemy. But if, while prosecuting his business in a foreign country, he contemplates a return to his own; if, in the prosecution of that business, he is promoting rather than counteracting the interests and policy of the country of which he is a member, it would seem to me to be pressing the principle too far, and to be drawing conclusions which the premises will not warrant, to infer, conclusively, an intention to continue in a country which has become hostil, from a residence and trading in that country while it was friendly; and to punish him by the confiscation of his goods, as if he was fully convicted of that intention.
It is admitted to be a general rule, that, while the state of things remains unaltered, while the motives which carried the citizen abroad continue, while he still prosecutes a business of uncertain duration, his capacity to prosecute which is not impaired, his mercantile character is confounded with that of the country in which he resides, and his trade is considered as the trade of that country.
It will require but a slight examination of the subject to perceive the reason of this rule; and that, to a certain extent, it is convenient without being unjust.
In times of universal peace, the question of national character can arise only when some privilege or some disability is attached to it, or in cases of insurance. A particular trade may be allowed or be prohibited to the merchants of a particular nation, or property may be warranted to be of a particular nation. If, in such cases, the residence of the individual be received as evidence of his national mercantile character, the subjects of enquiry are simplified, the questions are reduced to a plain one, and the various complex enquiries, which might otherwise arise, are avoided. There is, therefore, much convenience in adopting this principle in such a state of things; and it is not perceived that any injustice can grow out of it; since the individual to whom the rule is applied is not surprised by any new or unlooked for event.
So if war exists between two nations. Each belligerent *295 having a right to capture the property of the other found on the ocean, each being intent on destroying the commerce of the other, and on depriving it of every cover under which it may seek to shelter itself, will certainly not allow the advantages of neutrality to a merchant residing in the country of his enemy. Were this permitted, the whole trade of the enemy could assume, and would assume, a neutral garb.
There is, in general, no reason for supposing that a merchant residing in a foreign country, and carrying on trade, means to withdraw from it, on its engaging in war with any other country to which he is bound by no obligation. By continuing, during war, the domicil acquired in peace, he violates no duty, offends against no generally acknowledged principle, and retains all his rights of residence and commerce. The war, then, furnishes no motive for presuming that he is about to change his situation, and to resume his original national character.
These reasons appear to me to require the rule as a general one, and to justify its application to general cases. But they do not, in my opinion, justify its application to the case of a merchant whom war finds engaged in trade in a country which becomes the enemy of his own. His country ought not, I think, to bind him by his residence during peace; nor to consider him as precluded by it from showing an intention that it should terminate with the relations of peace.
When it is considered that his right to remain and prosecute that trade in which he had been engaged during peace, is forfeited; that his duty, and most probably his inclinations, call him home; that he has become the enemy of the country in which he resides; that his continuance in it exposes him to many and serious inconveniences; that his person and property are in danger; it is not, I think, going too far to say that this change in his situation may be considered as changing his intention on the subject of residence, and as affording a presumption of intending to return.
Let it be remembered that, according to the law of nations, domicil depends on the intention to reside permanently *296 in the country to which the individual has removed; and that a change of this intention is, at any time, allowable. If, upon grounds of general policy and general convenience, while the circumstances under which the residence commenced, continue the same, residence and employment in permanent trade be considered as evidence of an intention to continue permanently in the country, and as giving a commercial national character, may not a total change in circumstances  a loss of the capacity to carry on the trade, be received, in the absence of all conflicting proof, as presumptive evidence of an intention to leave the country, and as extricating the trade, carried on in the time of supposed peace, from the national character, so far as to protect it from the perils of war? At any rate, do not reason and justice require that this change of circumstances should leave the question open to be decided on such other evidence as the war must produce?
The great object for which an American merchant fixes himself in a foreign country, is, most generally, to carry on trade between that country and his own. In almost every case of this description before the Court, the Claimant is a member of a house established in the United States; and his business abroad is subservient to the business at home. This trade is annihilated by the war.
If, while peace subsists between the United States and Great Britain, while the American merchant possesses there all the commercial rights allowed to the citizens of a friendly nation, and may carry on uninterruptedly his trade to his own country, he is presumed, his intentions being unexplained, to intend remaining there always, and may, for general convenience, be clothed with the commercial character of the nation in which he resides, ought this presumption to be extended, by his own government, beyond the facts out of which it grows, if the interest of the individual be materially affected by that extension? Do not reason and justice require that we should consider his original intention as being only co-extensive with the causes which carried him to and detained him in the country, as being, in its nature, conditional, and dependent on the continuance of those causes?
*297 If such a person were required, on his arrival in a foreign country, to declare his real intentions on the subject of residence, he would, most probably, say, if he spoke honestly, "I come for the purpose of trade: I shall remain while the situation of the two countries permits me to carry on my trade lawfully, securely, and advantageously: when that situation so changes as to deprive me of these rights, I shall return." His intention, then, to reside in the country, his domicil in it, and, consequently, his commercial character, unless he continued his trade after war, would be clearly limited by the duration of peace. It would not, I think, be unreasonable to say that the intention, to be implied from his conduct, ought to have the same limitation.
To me it seems that a mere commercial domicil acquired in time of peace, necessarily expires at the commencement of hostilites. Domicil supposes rights incompatible with a state of war. If the foreign merchant be not compelled to abandon the country, it is not because his commercial character confers on him a legal right to stay, but because he is specially permitted to stay. If in this I am correct, it would seem to follow, that, if all the legal consequences of a residence in time of peace do not absolutely terminate with the peace, yet the national commercial character which that residence has attached to the individual, is not so conclusively fixed upon him as to disqualify him from showing that, within a reasonable time after the commencement of hostilities, he made arrangements for returning to his own country. If a residence and trading after the war be not indispensably necessary to give the citizen merchant or his property a hostile character, yet removal, or measures showing a determination to remove, within a reasonable time after the war, may retroact upon property shipped before a knowledge of the war, and rescue that property from the hostile character attached to the property of the nation in which the individual resided.
The law of nations is a law founded on the great and immutable principles of equity and natural justice. To draw an inference against all probability, whereby a citizen, for the purpose of confiscating his goods, is clothed, against his inclination, with the character of an enemy, in consequence of an act which, when committed, *298 was innocent in itself, was entirely compatible with his political character as a citizen, and with the political views of his government, would seem to me to subvert those principles. The rule which, for obvious reasons, applies to the merchant in time of peace or in time of war, the national commercial character of the country in which he resides, cannot, in my opinion, without subverting those principles, apply a hostile character to his trade carried on during peace, so conclusively as to prevent his protecting it by changing that character within a reasonable time after a knowledge of the war.
My opinion, then, is, that a mere commercial domicil acquired by an American citizen in time of peace, especially if he be a member of an American house, and is carrying on trade auxiliary to his trade with his own country, ought not to be considered positively as continuing longer than the state of peace. The declaration of war is a fact which removes the causes that induced his residence in the foreign country. They no longer operate upon him. When they cease, their effects ought to cease. An intention which they produced, ought not to be supposed to continue. The character of his property shipped before a knowledge of the war, ought not to be decided absolutely by his residence at the time of shipment or capture, but ought to depend on his continuing to reside and trade in the enemy country, or on his taking prompt measures for returning to his own.
This is the conclusion to which my mind would certainly be conducted, might I permit it to be guided by the lights of reason and the principles of natural justice. But it is said that a course of adjudications has settled the law to be otherwise  that we cannot, without overturning a magnificent system bottomed on the broad base of national law, and of which the facts are admirably adjusted to each other, yield to the dictates of humanity on this particular question. Sir William Scott, it is argued at the bar, has, by a series of decisions, developed the principles of national law on this subject, with a perspicuity and precision which mark plainly the path we ought to tread.
*299 I respect sir William Scott, as I do every truely great man; and I respect his decision; nor should I depart from them on light grounds: but it is impossible to consider them attentively, without perceiving that his mind leans strongly in favor of the captors. Residence, for example, in a belligerent country, will condemn the share of a neutral in a house, trading in a neutral country; but residence in a neutral country will not protect the share of a belligerent or neutral in a commercial house established in a belligerent country. In a great maritime country, depending on its navy for its glory and its safety, the national bias is perhaps so entirely in this direction, that the judge, without being conscious of the fact, must feel its influence. However this may be, it is a fact of which I am fully convinced; and, on this account, it appears to me to be the more proper to investigate rigidly the principles on which his decisions have been made, and not to extend them where such extension may produce injustice.
While I make this observation, it would betray a want of candor not to accompany it with the acknowledgement that I perceive in the opinions of this eminent judge, no disposition to press this principle with peculiar severity against neutrals. He has certainly not mitigated it when applying it to British subjects.
With this impression respecting the general character of British admiralty decisions, I proceed to examine them so far as they bear on the question of domicil.
The case of the Vigilantia does not itself involve the point. But in delivering his opinion, the judge cited two cases of capture which have been quoted and relied on at bar. In each of these, the share of the partner residing in the neutral country, was restored, and that of the partner residing in the belligerent country was condemned. But these decisions applied to a trade continued to be carried on during war.
In a subsequent case, the share of the partner residing in the neutral country also was condemned; and the lords commissioners said that the principle on which restitution was decreed in each of the first mentioned cases, was, "that they were merely at the commencement *300 of a war." They said that "a person carrying "on trade habitually in the country of the enemy, "though not resident there, should have time to withdraw "himself from that commerce; that it would press "too heavily on neutrals to say that, immediately, on "the first breaking out of a war, their goods would become "subject to confiscation."
On these cases it is to be observed, that, although the two first happened at the commencement of the war, yet they happened during a war; and the partners whose interest was condemned, do not appear to have discontinued their residence and trading in the country of the enemy, after war had taken place. The declaration "that it would press too heavily on neutrals to say that, immediately on the first breaking out of a war, their goods would become subject to confiscation," though applied to a neutral not residing in the belligerent country, clearly discriminates, in a case of capture, between the rights of parties at the commencement of a war, and at a subsequent period. But it is sufficient to say that neither the case itself, nor the cases and opinions cited in it, apply directly to the question before this Court.
In the case of the Harmony, the property of Mr. Murray, an American citizen residing in France, was condemned on account of that residence. But Mr. Murray had removed to France, during the war, and had continued there for four years.
The scope of the argument of sir William Scott goes to show that the single circumstance of residence in the enemy country, if not intended to be permanent, will not give the enemy character to the property of such resident captured in a trade between his own country and that of the enemy. It is material that the conduct of Mr. Murray, subsequent to the capture, had great influence in determining the fate of his property. Had he returned to the United States immediately after that event, I do not hazard much in saying that restitution would have been decreed.
In the case of the Indian Chief, Mr. Johnson, an American citizen domiciliated in England, had engaged *301 in a merchantile enterprize to the British East Indies  a trade allowed to an American citizen, but prohibited to a British subject. On its return, the vessel came into Cowes, and was seized for being concerned in illicit trade. Mr. Johnson had then left England for the United States. He was considered as not being a British subject at the time of capture, and restitution was decreed.
In delivering his opinion in this case, sir William Scott said, "Taking it to be clear that the national character of Mr. Johnson, as a British merchant, was founded in residence only, that it was acquired by residence, and rested on that circumstance alone, it must be held, that, from the moment he turns his back on the country where he has resided, on his way to his own country, he was in the act of resuming his original character, and is to be considered as an American. The character that is gained by residence, ceases by non-residence. It is an adventitious character that no longer adheres to him from the moment that he puts himself in motion, bona fide, to quit the country sine animo revertendi."
This case undoubtedly proves, affirmatively, that the national character gained by residence ceases with that residence; but I cannot admit it to prove, negatively, that this national character can be laid down by no other means. I cannot, for instance, admit that an American citizen, who had gained a domicil in England during peace, and was desirous of returning home on the breaking out of war, but was detained by force, could, under the authority of this opinion, be treated as a British trader, with respect to his property embarked before a knowledge of the war.
In the case of La Virginie, the property of a Mr. Lapierre, who was probably naturalized in the United States, but who had returned to St. Domingo, and had shipped the produce of that island to France, was condemned. But he was considered as a Frenchman, was residing at the time in a French colony, and was engaged in a trade between that colony and the mother country. The case, the judge observed, might have been otherwise decided, had the shipment been made to the U. States.
*302 In the case of the Jonge Clarissa, Mr. Ravie had a license to make certain importations as a British subject. He had a house in Amsterdam, went there in person during the war, and made the shipment under his own inspection and control. It was determined that, in this transaction, he acted in his character as a Dutch merchant, and was not protected by his license. This was a trading during war.
In the case of the Citto, the property of Mr. Bowden, a British subject residing in Holland, was condemned. It appeared that he had settled in Amsterdam, where he has resided, carrying on trade, for six years. In 1795, when the French troops took possession of that country, he left it and settled in Guernsey. The Citto was a Danish vessel captured in April, 1796, on a voyage from a Spanish port to Guernsey, where Mr. Bowden then resided. In June, 1796, after the capture of the Citto, he returned to Holland. In argument, it was contended, that it appeared that British subjects might reside in Holland, without forfeiting their British character, from the proclamation of the 3d of September, 1796, which directs the landing of goods, imported under that order into the united provinces, to be certified by British merchants resident there.
The judge was desirous of knowing the nature of Mr. Bowden's residence in Holland  whether he had confined himself to the object of withdrawing his property, or had been engaged in the general traffic of the place. If the former, "he may," said the judge, "be entitled to "restitution; more especially adverting to the order in "council, which is certainly so worded as not to be very "easy to be applied."
The cause stood for further proof.
It is plain that, in this opinion, the residence of the Claimant at the time of capture was not considered as conclusive. Had it been so, restitution must have been decreed, because Mr. Bowden was a British subject, and, at that time, resided in Guernsey. It is equally apparent, that, had his subsequent residence in the enemy country been for the sole purpose of withdrawing his property, the law was not understood to forbid restitution. *303 The language of sir William Scott certainly ascribes considerable influence to the proclamation, but does not rest the right of the Claimant altogether on that fact.
On the 17th of March, 1800, an affidavit of Mr. Bowden, made the 6th of August, 1799, was produced, in which he stated his residence in Holland previous to the invasion by the French. That he quitted Holland and landed in England, the 20th of January, 1795, whence he proceeded to Guernsey, where he resided with his family. That, in the month of June, 1796, he was under the absolute necessity of returning to Holland, for the purpose of recovering debts due and effects belonging to the partnership, his partner remaining in Guernsey.
The affidavit then proceeded to state many instances of his attachment to his own government, and concluded with averring that he was still under the necessity of remaining in Holland, for the purpose of recovering part of the said debts and effects, which would be impossible were he to leave the country; but that it was his intention to return to his native country, so soon as his affairs would permit where his mother and his relations reside.
The Court observed that it appeared, from the affidavit, that Mr. Bowden was, at that time, in Holland; and added, "it would be a strange act of injustice, if while "we are condemning the goods of persons of all nations "resident in Holland, we were to restore the goods of "native British subjects resident there. An Englishman "residing and trading in Holland, is just as much a "Dutch merchant as a Swede or a Dane would be."
This case was decided in 1800. Mr. Bowden had returned to Holland in 1796, during the war, and had continued in the country of the enemy. It is not denied that he continued his trade, and the fact that he did continue it is fairly to be inferred, not only from his omitting to aver the contrary, but from the language of sir William Scott. "An Englishman residing and trading in Holland," says that judge, "is just as much a Dutch "merchant as a Swede or a Dane would be." The case of Mr. Bowden, then, is the case of a British subject who continued to reside and trade in the enemy country four years after the commencement of hostilities. His *304 property must have been condemned on one of two principles. Either the judge must have considered his residence in Guernsey, from January, 1795 to June, 1796, as a temporary interruption of his permanent residence in Holland, and not as a change of domicil, since he returned to that country, and continued in it, as a trader, to the rendition of the final sentence; or he must have decided that, although Mr. Bowden remained and intended to remain in fact a British subject, yet the permanent national commercial character which he acquired after this capture, retroacted on a trade which, at the time of capture was entirely British, and subjected the property to confiscation. On whichsoever of these principles the case was decided, it is clear that the hostile character attached to the property of Mr. Bowden in consequence of his residing and trading in the country of the enemy during the war. This case is, I think, materially variant from one in which the residence and trading took place during peace, and the capture was made before a change of residence could be conveniently effected.
The Diana is also a case, of considerable interest, which contains doctrines entitled to attentive consideration.
During the war between Great Britain and Holland, which commenced in 1795, the island of Demarara, surrendered to the British arms. By the treaty of Amiens, it was restored to the Dutch. That treaty contained an article allowing the inhabitants, of whatever country they might be, a term of three years, to be computed from the notification of the treaty, for the purpose of disposing of their property acquired and possessed before or during the war, in which term they may have the full exercise of their religion and enjoyment of their property.
Previous to the declaration of war against Holland, in 1803, the Diana and several other vessel, loaded with colonial produce, were captured on a voyage from Demarara to Holland. Immediately after the declaration of war, and before the expiration of three years from the notification of the treaty of Amiens, Demarara again surrendered to Great Britain. Claims to the captured *305 property were filed by original British subjects, inhabitants of Demarara, some of whom had settled in the colony while it was in possession of Great Britain, others before that event. The trial came on after the island had again become a British colony.
Sir William Scott decreed restitution to these British subjects who had settled in the colony while in British possession, but condemned the property of those who had settled there before that time. He held, that their settling in Demarara while belonging to Great Britain, afforded a presumption of their intending to return, if the island should be transferred to a foreign power; which presumption, recognized in the treaty, relieved those Claimants from the necessity of proving such intention. He thought it highly reasonable that they should be admitted to their jus postliminii, and be held entitled to the protection of British subjects.
But the property of those Claimants who had settled before it came to the possession of Great Britain, was condemned. "Having settled without any faith in British possession, it cannot be supposed," he said, "that "they would have relinquished their residence, because "that possession had ceased. They had passed from "one sovereignty to another with indifference; and if "they may be supposed to have looked again to a connexion "with this country, they must have viewed it as "a circumstance that was in no degree likely to affect "their intention of continuing there." "On the situation "of persons settled there previous to the time of "British possession, I feel myself," said the judge, "obliged to pronounce that they must be considered in "the same light as persons resident in Amsterdam. It "must be understood, however, that if there were among "these, any who have been actually removing, and that "fact is properly ascertained, their goods may be capable "of restitution. All that I mean to express is, that "there must be evidence of an intention to remove, on "the part of those who settled prior to British possession, "the presumption not being in their favor."
This having been a hostile seizure, though made before the declaration of war, the property is held equally *306 liable to condemnation as if captured the instant of that declaration.
So much of the case as relates to those Claimants who had settled during British possession, proves that other circumstances than an actual getting into motion for the purpose of returning to his own country, may create a presumption of intending to return; and may put off that hostile commercial character which a British subject residing and trading in the country of an enemy, is admitted to acquire. The settlement having been made in a country which, at the time, was in possession of Great Britain, though held only by the right of conquest  a tenure known to be extremely precarious, and rarely to continue longer than the war in which the acquisition is made, is sufficient to create this presumption; but the case does not declare negatively that no other circumstances would be sufficient.
I am aware that the part of the case which applies to Claimants who had settled previous to British possession, will, at first view, appear to have a strong bearing on the question before the Court. The shipment was in time of peace, and the seizure was made before the declaration of war. The trade was one in which a British subject, in time of peace, might lawfully engage. However strong his intention might be to return to his native country in the event of war, he could not be expected to manifest that intention before the actual existence of war. The re-conquest of the island followed the declaration of war so speedily, as scarcely to leave time for putting in execution the resolution to return, had one been formed. Taking these circumstances into view, the condemnation would seem to be one of extreme severity. Yet even this case, admitting the decision to be perfectly correct, does not, I think, when accurately examined, go so far as to justify a condemnation under such circumstances as belong to some of the cases at bar.
The island having surrendered during war, such of its inhabitants as were originally British subjects were not allowed to derive, from this re-annexation to the dominions of Great Britain, the advantages to which a voluntary return to their own country, of the same *307 date, would have entitled them. They were considered as if they had been "residents of Amsterdam."
But sir William Scott observes, that "if there are "among these any who have been actually removing, "and that fact is properly ascertained, their goods may "be capable of restitution." "Actually removing"  when? Not, surely, before the seizure; for that was made in time of peace. Not before the declaration of war, when the original seizure was converted into a belligerent capture; for until that declaration was known, a person whose intention to remain or return was dependant on peace or war, would not be "actually removing." On every principle of equity, then, the time to which these expressions refer, must be the surrender of Demarara, or a reasonable time after the declaration of war was known there. The one period or the other would be subsequent to that event which was deemed equivalent to capture.
It is not unworthy of remark, that sir William Scott adds explanatory words which qualify and control the words "actually removing," and show the sense in which he used them. "All," says the judge, "that I "mean to express is, that there must be evidence of an "intention to remove, on the part of those who settled "prior to British possession, the presumption not being "in their favor.
It would, then, I think, be rejecting a part, and a material part, of the opinion, to say that an intention to remove clearly proved, though not accompanied by the fact of removal, would have been deemed insufficient to support the claim for restitution.
Were there no other circumstances of real importance in this case  did it rest solely on the sentiments expressed by the judge, unconnected with those circumstances, I should certainly consider it as leaving open to the Claimants before this Court, the right of proving an intention to return within a reasonable time after the declaration of war, by other overt-acts than an actual removal.
But there are other circumstances which I cannot *308 deem immaterial; and, as the opinions of a judge are always to be taken with reference to the particular case in which they are delivered, I must consider these expressions in connexion with the whole case.
The probability is, that the Claimants were not merely British merchants. Though the fact is not expressly stated, there is some reason to believe that they had become proprietors of the soil, and were completely incorporated with the Dutch colonists. They are not denominated merchants. They are spoken of, through the case, not as residents, but as settlers. "They had "passed," said sir William Scott, "from one sovereignty "to another with indifference." This mode of expression appears to me to indicate a more permanent interest in the country  a more intimate connexion with it than is acquired by a merchant removing to a foreign country, and residing there in time of peace, for the sole purpose of trade. And in another of the same class of cases, it is said that, previous to the last war, the principal plantations of the island were in possession of British planters from the other British islands.
The voyage, too, in making which the Diana was captured, was a direct voyage between the colony and the mother country. The trade was completely Dutch; and the property of any neutral, wherever residing, if captured in such a voyage, during war, would be condemned.
But it is still more material that those who settled in Demarara before British possession, must have settled during the war which was terminated by the treaty of Amiens: or, if they settled in time of peace, must have continued there while the colony was Dutch, and while Holland was at war with Great Britain. Which ever the fact might be, whether they had settled in an enemy country during war, or had continued, through the war, a settlement made in time of peace, they had demonstrated that war made no change in their residence. In their case, then, it might be correctly said, "that war "created no presumption of an intention to return"  "that they passed from one sovereignty to another with "indifference."
*309 I cannot consider claims under these circumstances, as being in the same equity with claims made by persons who had removed into a foreign country, in time of peace, for the sole purpose of trade, and whose trade would be annihilated by war.
The case of the Boedes Lust differs from the Diana only in this: the Claimants are not alleged to have been originally British subjects. Restitution was asked, because the property did not belong to an enemy at the time of shipment, nor at the time of seizure, nor at the time of adjudication. These grounds were all declared to be insufficient. The original seizure was provisionally hostile; and the declaration of war consummated the right to condemn, and vested the property in the crown, as enemy property. The subsequent change in the character of the Claimants, who became British subjects by the surrender of Demarara, could not divest it. "Where property is taken in a state of hostility," said sir William Scott, "the universal practice has ever "been to hold it subject to condemnation, although the "Claimants may have become friends and subjects prior "to adjudication." "With as little effect," he added, "can it be contended that a postliminium can be attributed "to these parties. Here is no return to the "original character, on which only a jus postliminii can "be raised. The original character at the time of "seizure, and immediately prior to the hostility which "has intervened, was Dutch. The present character, "which the events of war have produced, is that of "British subjects; and, although the British subject "might, under circumstances, acquire the jus postliminii, "upon the resumption of his native character, it "never can be considered that the same privilege accrues "upon the acquisition of a character totally new "and foreign."
This opinion is certainly not decisive; but it appears to me rather to favor than oppose the idea, that a merchant residing abroad, and taking measures to return on the breaking out of war, may entitle himself to the jus postliminii, with respect to property shipped before a knowledge of the war.
The President was captured on a voyage from the *310 Cape of Good Hope to Europe. Mr. Elmslie, the Claimant, was born a British subject, but claimed as a citizen of the United States. He had removed to the Cape of Good Hope, during the preceding war, and still resided there. The property was condemned. In delivering his opinion, sir William Scott observed, "It "is said the Claimant is intitled to the benefit of an intention "of removing to Philadelphia, in a few months. "A mere intention to remove, has never been held sufficient "without some overt-act, being merely an intention "residing secretly and undistinguishably in the "breast of the party, and liable to be revoked every "hour. The expressions of the letter in which this intention "is said to be found, are, I observe, very weak "and general, of an intention merely in futuro. Were "they even much stronger than they are, they would "not be sufficient. Something more than mere verbal "declaration, some solid fact showing that the party is "in the act of withdrawing, has always been held necessary "in such cases."
It is to be held in mind, that this opinion is delivered in the case of a person who had fixed his residence in an enemy country, during war, and that he claimed to be the subject of a neutral state. For both these reasons, the war afforded no presumption of his intending to return either to his native or adopted country. To the vague expression of an intention to return at some future indefinite time, no influence can be ascribed. When the judge says that "something more than mere "verbal declaration, some solid fact showing that the "party is in the act of withdrawing, has always been "held necessary in such cases," I do not understand him to say that the person must have put himself in personal motion to return, must have commenced his voyage homeward, in order to be considered as in "the act of withdrawing." Many other overt-acts, as selling a commercial establishment, stopping business, making preparations to return, accompanied by declarations of the intent, and not opposed by other circumstances, may, in my opinion, be considered as acts of withdrawing.
In the case of the Ocean, sir William Scott said "This "claim relates to the situation of British subjects settled *311 "in a foreign state, in time of amity, and taking "early measures to withdraw themselves, on the "breaking out of war. The affidavit of claim states "that this gentleman had been settled as a partner in "a house of trade in Holland, but that he had made arrangements "for the dissolution of the partnership, and "was only prevented from removing personally, by the "violent detention of all British subjects who happened "to be within the territories of the enemy, at the breaking "out of the war. It would, I think, under these "circumstances, be going further than the principle "of law requires, to conclude this person by his former "occupation, and by his present constrained residence "in France, so as not to admit him to have taken himself "out of the effect of supervening hostilities, by the "means which he had used for his removal."
If other means for removal were taken, than arrangements for the dissolution of the partnership, they are not stated; and it is fairly to be presumed, that these arrangements were the most permanent of them, since that fact is alone selected and particularly relied upon. In his statement of the case, the reporter says that the Claimant had actually made his escape and returned to England, in July, 1803; (the trial was in January, 1804) but this must be a mistake, or is a fact not adverted to by the judge, since he says, in his opinion, that the Claimant is, at the time, "a constrained resident of France."
I shall notice two other cases which are frequently cited, though I have seen no full report of either of them.
The first is the case of Mr. Curtissos. This gentleman, who was a British subject, had gone to Surinam in 1766, and from thence to St. Eustatius, where he remained till 1776. He then went to Holland to settle his accounts, and with an intention., "as was said," of returning afterwards to England to take up his final residence. In December, 1780, orders of reprisal were issued by England against Holland. On the first of January, 1781, the Snelle Zeylder was captured, and, on the 5th of March and 10th of April, 1781, the vessel and cargo were condemned as Dutch property. On *312 the 27th of April, 1781, Mr. Curtissos returned to England: and, on an appeal, the sentence of condemnation was reversed by the lords of appeals, and restitution decreed.
Other claims of Mr. Curtissos were brought before the Court of admiralty; and, on a full disclosure of these circumstances, restitution was decreed, before the decree of the lords in the case of the Snelle Zeylder was pronounced.
The principle of this decree is said to be, that Mr. Curtissos was in itinere, and had put himself in motion, and was in pursuit of his original British character.
I do not mean to find fault with this decision; but certainly it presents some strong points more unfavorable to the Claimant than will be found in some of the cases now before this Court. Mr. Curtissos had obtained a commercial domicil in the country of the enemy. At the time of the sailing, capture and condemnation of the Snelle Zeylder, he still resided in the country of the enemy. But it is said he was in itinere; he was in motion in pursuit of his original British character. What was this journey he is said to have been performing in pursuit of his original character? He had passed from one part of the dominions of the united provinces to another. He had moved his residence from St. Eustatius to Holland, where he remained from the year 1776 till 1781  a time of sufficient duration for the acquisition of a domicil, had he not previously acquired it. This change of residence, to make the most of it, is an act too equivocal in itself to afford a strong presumption that it was made for the purpose of returning to England. Had his stay in Holland even been short, a colonial merchant trading to the mother country, may so frequently be carried there on the business of his trade, that the fact can afford but weak evidence of an intention to discontinue that trade: but an interval of between four and five years elapsed between his arrival in Holland and his departure from that country, during which time he is not stated to have suspended his commercial pursuits, or to have made any arrangements, such as transferring his property to England, or making an establishment there, which might indicate, *313 by overt-acts, the intention of returning to his native country. This journey to Holland, connected with this long residence, would seem to me to be made as a Dutch merchant for the purpose of establishing himself there, rather than a preparatory to his return to England. But it was said that he intended to return to England. How was this intention shown? If not by his journey to Holland and his long residence there, it was only shown by his being employed in the settlement of his accounts while a merchant at St. Eustatius, a business in which he would of course engage, whatever his future objects might be. This equivocal act does not appear to have been explained, otherwise than by his own declarations; nor does it appear that these declarations were made previous to the capture.
But could I even admit that the journey from St. Eustatius to Holland was made with a view of passing ultimately from Holland to England, yet the intention was not to be immediately executed. The time of carrying it into effect, was remote and uncertain; subject to so many casualties that, had not the war supervened, it might never have been carried into effect.
But laying aside these circumstances, the case proves only that being in itinere, in pursuit of the native character, divests the enemy character acquired by residence and trading; it is not insinuated that this character can be divested by no other means.
Mr. Whitehills case, though one of great severity, does not, I think, overturn the principle I am endeavoring to sustain. He went to St. Eustatius but a few days before admiral Rodney and the British forces made their appearance before that place. But it was proved that he went for the purpose of making a permanent settlement there. No intention to return appears to have been alleged. The recency of his establishment seems to have been the point on which his claim rested.
This case, in principle, bears on that before the Court, so far only as it proves that war does not, under all circumstances, necessarily furnish a presumption, that the foreigner residing in the enemy country, intends to return to his own. The circumstances of this *314 case, so far as we understand them, were opposed to the presumption that war could affect Mr. Whitehills residence. War actually existed at the time of his removal; and had that fact been known to him, there would have been no hardship in his case. He would have voluntarily taken upon himself the enemy character at the same time that he took upon himself the Dutch character. There is reason to believe that the Court considered him in equal fault with a person removing to a country known to be hostile. St. Eustatius was deeply engaged in the American trade, which, from the character of the contest, was, at that time, considered by England as cause of war, and was the fact which drew on that island the vengeance of Britain. Mr. Whitehill could have fixed himself there only for the purpose of prosecuting that trade. "He went," says sir William Scott, "to a place which had rendered itself particularly obnoxious by its conduct in that war." This was certainly a circumstance which could not be disregarded, in deciding on the probability of his intending to remain in the country in the event of war.
These are the cases which appear to me to apply most strongly to the question before this Court. No one of them decides, in terms, that the property of a British subject residing abroad in time of amity, which was shipped before a knowledge of war, and captured by a British cruizer, shall depend, conclusively, on the residence of the Claimant at the time of capture, or on his having, at that time, put himself in motion to change his residence. In no case which I have had an opportunity of inspecting, have I seen a dictum to this effect. The cases certainly require an intention, on the part of the subject residing and trading abroad, to return to his own country, and that this intention should be manifested by overt-acts; but they do not, according to my understanding of them, prescribe any particular overt act, as being exclusively admissible; nor do they render it indispensable that the overt act should, in all cases, precede the capture. If a British subject residing abroad for commercial purposes, takes decided measures, on the breaking out of war, for returning to his native country, and especially if he should actually return, his claim for the restitution of property shipped before his knowledge of *315 the war, would, I think, be favorably received in a British Court of admiralty, although his actual return, or the measures proving his intention to return, were subsequent to the capture. Thus understanding the English authorities, I do not consider them as opposing the principle I have laid down.
An American citizen having merely a commercial domicil in a foreign country, is not, I think, under the British authorities, concluded, by his residence and trading in time of peace, from averring and proving an intention to change his domicil on the breaking out of war, or from availing himself of that proof in a Court of admiralty. The intrinsic evidence arising from the change in his situation, produced by war, renders it extremely probable that in this new state of things he must intend to return home, and will aid in the construction of any overt-act by which such intention is manifested. Dissolution of partnership, discontinuance of trade in the enemy country, a settlement of accounts, and other arrangements obviously preparatory to a change of residence, are, in my opinion, such overt-acts as may, under circumstances showing them to be made in good faith, entitle the Claimant to restitution.
I do not perceive the mischief or inconvenience than can result from the establishment of this principle. Its operation is confined to property shipped before a knowledge of the war. For if shipped afterwards, it is clearly liable to condemnation, unless it be protected by the principle that it is merely a withdrawing of funds. Being confined to shipments made before a knowledge of the war, the evidence of an intention to change or continue a residence in the country of the enemy, must be speedily given. A continuance of trade after the war, unless, perhaps, under very special circumstances, and for the mere purpose of closing transactions already commenced, would fix the national character and the domicil previously acquired. An immediate discontinuance of trade, and arrangements for removing, followed by actual removal within a reasonable time, unless detained by causes which might sufficiently account for not removing, would fix the intention to change the domicil, and show that the intention to return had never been abandoned; that the intention to remain always had never *316 been formed. It is a case in which, if in any that can be imagined, justice requires that the citizen, having entirely recovered his national character by his own act, and by an act which shows that he never intended to part with it finally, should, by a speciesof the jus postliminii, be allowed to aver the existence of that character at the instant of capture. In the establishment of such a principle, I repeat, I can perceive no danger. In its rejection, I think I perceive much injustice. An individual whose residence abroad is certainly innocent and lawful, perhaps advantageous to his country, who never intended that residence to be permanent, or to continue in time of war, finds himself, against his will, clothed with the character of an enemy, so conclusively that not even a return to his native country can rescue from that character and from confiscation, property shipped in the time of real or supposed peace. My sense of justice revolts from such a principle.
In applying this opinion to the Claimants before the Court, I should be regulated by their conduct after a knowledge of the war. If they continued their residence and trade after that knowledge, at any rate after knowing that the repeal of the orders in council was not immediately followed by peace, their claim to restitution would be clearly unsustainable. If they took immediate measures for returning to this country, and have since actually returned, or have assigned sufficient reasons for not returning, their property I think may be capable of restitution. Some of the Claimants would come within one description, some within the other. It would, under the opinion given by the Court, be equally tedious and useless to go through their cases.
My reasoning has been applied entirely to the case of native Americans. This course has been pursued for two reasons. It presents the argument in what I think its true light; and the sentence of condemnation makes no discrimination between native and other citizens.
The Claimants are natives of that country with which we are at war, who have been naturalized in the United States. It is impossible to deny that many of the strongest arguments urged to prove the probability that war must determine the native American citizen to abandon *317 the country of the enemy and return home, are inapplicable, or apply but feebly, to citizens of this description. Yet I think it is not for the United States, in such a case as this, to discriminate between them.
I will not pretend to say what distinctions may or may not exist between these two classes of citizens, in a contest of a different description. But in a contest between the United States and the naturalized citizen, in a claim set up by the United States to confiscate his property, he may, I think, protect himself by any defence which would protect a native American. In the prosecution of such a claim, the United States are, I think, if I may be excused for borrowing from the common law a term peculiarly appropriate, estopped from saying that they have not placed this adopted son on a level with those born in their family.
LIVINGSTON, J. concurred in opinion with the Chief Justice.